## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ALABAMA

| | |
|---|---|
| CHRISTOPHER LEE PRICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 19-57 |
| v. | ) |
| | ) |
| JEFFERSON S. DUNN, COMMISSIONER, ALABAMA DEPARTMENT OF CORRECTIONS, in his official capacity, | ) ) ) ) ) |
| | ) |
| CYNTHIA STEWART, WARDEN, HOLMAN CORRECTIONAL FACILITY, in her official capacity, and | ) ) ) ) ) |
| | ) |
| OTHER UNKNOWN EMPLOYEES AND AGENTS, ALABAMA DEPARTMENT OF CORRECTIONS, in their official capacities, | ) ) ) ) ) |
| | ) |
| Defendants. | ) ) |

## COMPLAINT

## NATURE OF THE ACTION

1.     Plaintiff Christopher Lee Price is a death row inmate who resides in Alabama's Holman Correctional Facility.

2.     On January 11, 2018, the State of Alabama (the "State") asked the Alabama Supreme Court to set an execution date for Mr. Price.  The State's motion is pending.

3.     The State intends to execute Mr. Price using a three-drug lethal injection protocol that utilizes midazolam hydrochloride as the first drug. Midazolam hydrochloride, however, is not a surgical-grade general anesthesia drug.  It is merely a sedative, and its utilization as the first drug in multi-drug lethal injection protocols has resulted in numerous "botched" executions—that is, executions where the inmate appeared to be experiencing substantial physical pain for up to an hour before dying—in a number of states, including in Alabama.  These botched executions have resulted in substantial public criticism and scrutiny by the Department of Justice.

4.     The State intends to execute Mr. Price with a midazolam-based three-drug protocol even though there now exists in Alabama a feasible, readily implemented alternative that would significantly reduce the substantial risk of severe pain to Mr. Price—namely, nitrogen hypoxia.

5.     Nitrogen hypoxia was not an authorized method of execution in the State until June 1, 2018, when Governor Kay Ivey signed a newly-passed law authorizing the use of nitrogen hypoxia in executions in Alabama.

6.      After June 1, 2018, the State entered into agreements with numerous Holman death row inmates; the agreements provide that the State will execute the inmates with nitrogen hypoxia instead of the midazolam-based lethal injection protocol.  The State has attempted to keep these agreement secret from the public, including Mr. Price's counsel.  Mr. Price's counsel learned about the secret agreements, however, in January 2019.

7.      Within three weeks of learning about the secret agreements that the State has entered into with Holman death row inmates who are similarly situated to Mr. Price, Mr. Price's counsel, at Mr. Price's instruction, sent an email to Assistant Attorney General Henry Johnson requesting that the State enter into that same agreement with him.  The State refused Mr. Price's request for two reasons.  First, the State falsely denied that it has agreements with other Holman death row inmates to execute them only with the nitrogen hypoxia protocol and not a lethal injection protocol.  Second, the State claimed that Mr. Price was required to notify the State between June 1 and June 30, 2018 of his desire to be executed with nitrogen hypoxia, rather than a midazolam-based lethal injection protocol.

8.      By refusing to treat all similarly situated Holman death row inmates the same with respect to method of execution, the State has created two classes of death row inmates: death row inmates who will be executed

with the gruesome midazolam-based lethal injection protocol, and those who will not.

9.     The State has been aware since October 8, 2014 of Mr. Price's constitutional objections to the midazolam-based lethal injection protocol.  It was on that date that Mr. Price filed a federal civil rights lawsuit alleging that (a) the midazolam-based lethal injection protocol will cause him to feel substantial pain during the dying process, similar to the sensation of being suffocated and burned at the stake at the same time, and (b) compounded pentobarbital, which has a track record of successfully anaesthetizing death row inmates during lethal injections, is an available alternative to midazolam hydrochloride.  That lawsuit remains pending as of February 8, 2019. Although the district court in that lawsuit ruled against Mr. Price after a bench trial, the district court did so only on the grounds that Mr. Price had not carried his burden of showing that compounded pentobarbital is readily available to the State at the time.  The district court did not reach the question of whether a midazolam-based lethal injection protocol will cause Mr. Price to suffer substantial pain during his execution.

10.     The midazolam-based lethal injection protocol will cause Mr. Price substantial pain, and the alternative method of nitrogen hypoxia is now an available method of execution in the State that, if implemented properly, will substantially reduce the risk of substantial pain.

4

11.     By refusing to execute Mr. Price with the nitrogen hypoxia protocol, the State is in violation of the Eighth Amendment and Fourteenth Amendments to the United States Constitution.

12.     By refusing to treat Mr. Price the same, with respect to execution method, as similarly situated Holman death row inmates, the State is in violation of the Equal Protection Clause of the Fourteen Amendment to the United States Constitution.

13.     Mr. Price therefore brings this action pursuant to 42 U.S.C. § 1983 to enjoin the State from carrying out his execution in the manner that the State has proposed (*i.e.*, with the midazolam-based lethal injection protocol).

## JURISDICTION AND VENUE

14.     This court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a), 2201, and 2202.

15.     Venue is appropriate in this court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

16.     Mr. Price is a United States citizen and resident of the State of Alabama.  He is currently imprisoned under the supervision of the defendants.

17.    Defendant Colonel Jefferson Dunn has been the Commissioner of the Alabama Department of Corrections (the "ADOC") since April 1, 2015.

18.    Defendant Cynthia Stewart is the Warden of the Holman Correctional Facility in Atmore, Alabama, where Mr. Price is currently incarcerated and where Alabama conducts its executions by lethal injection. By state statute, Defendant Stewart is responsible for carrying out Mr. Price's execution or delegating that responsibility to another member of Holman's prison staff.

19.    Unknown Employees and Agents of the ADOC are involved in the development of Alabama's lethal injection protocols and the carrying out of executions by lethal injection or other means.  Mr. Price does not know the identities of these persons.

20.    All defendants are being sued in their official capacities.

## JUSTICIABLE CASE OR CONTROVERSY

21.    There is an actual and justiciable case or controversy between the parties.  Specifically, absent judicial intervention, the State plans to execute Mr. Price using a three-drug protocol that Defendants unilaterally decided to adopt on September 10, 2014.  As further described herein, this three-drug protocol is substantially likely to subject Mr. Price to extreme pain, in violation of the Eighth and Fourteenth Amendments to the United

6

States Constitution and well-established United States Supreme Court precedent.  As also further described herein, the State's refusal to enter into an agreement with Mr. Price that he be executed with the nitrogen hypoxia protocol, when the State has entered into such agreements with numerous similarly situated Holman death row inmates, constitutes a violation of the Equal Protection Clause of the Fourteenth Amendment.

22.    Upon information and belief, there is no administrative process through which Mr. Price can challenge the drugs or other procedures to be utilized in carrying out his death sentence.

## PROCEDURAL BACKGROUND

23.    When Mr. Price was a senior in high school, he participated in a burglary during which the homeowner, William Lynn, was killed.  At the time of the crime, Mr. Price had neither a serious criminal record nor any reported history of violence.  Mr. Price was represented by court-appointed counsel who inexplicably chose not to introduce mitigation evidence during the penalty phase of Mr. Price's trial.  Despite his trial counsel's failings, Mr. Price's direct and collateral challenges to his death sentence were unsuccessful.

24.    On September 11, 2014, the State asked the Alabama Supreme Court to set an execution date for Mr. Price.  Mr. Price's opposition to the State's motion was filed on October 9, 2014.  The State's motion was held in

abeyance pending the resolution in the United States Supreme Court of *Glossip v. Gross*, 135 S.Ct. 2726 (2015).

25.    On October 8, 2014, Mr. Price challenged the State's proposed use of midazolam as the first drug in the lethal injection protocol pursuant to 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution in this Court. *Price v. Dunn et al.*, 14-cv-472 (S.D. Ala.) (*hereinafter Price I*).  In *Price I*, Mr. Price alleged that pentobarbital and sodium thiopental, which had been previously used by the ADOC in executions between 2002 to 2013, were feasible, readily implemented alternatives to midazolam.[1]

26.    On June 29, 2015, the United States Supreme Court issued its opinion in *Glossip* and held that a plaintiff challenging a method of execution "must identify an alternative [method of execution] that is 'feasible, readily implemented, and in fact significantly reduce[s] a substantial risk of severe pain.'"  135 S.Ct. at 2737.

27.    In light of the Supreme Court's *Glossip* decision, the district court in *Price I* bifurcated the trial proceedings, with phase one focusing on whether pentobarbital was an available alternative to midazolam under the framework announced in *Glossip*.  If Mr. Price had satisfied his burden at

---

[1] Mr. Price subsequently did not pursue sodium thiopental as an available alternative.

phase one, then phase two would have focused on, *inter alia*, whether the use of midazolam hydrochloride as the first drug in the State's three-drug protocol poses a substantial risk that Mr. Price will experience severe pain during the execution.

28.    The "phase one" trial was held on December 12, 2016.  In an opinion dated March 15, 2017, the district court granted judgment in favor of the ADOC on the ground that compounded pentobarbital was not available to the ADOC.  *See Price I*, 2017 WL 1013302 (S.D. Ala. Mar. 15, 2017).  The district court abstained from deciding any of the other legal or factual issues that Mr. Price's claims presented, including whether a the State's three-drug protocol subjects Mr. Price to a substantial risk of severe pain.

29.    Mr. Price filed a timely appeal of the district court's decision in the United States Court of Appeals for the Eleventh Circuit.  The Eleventh Circuit filed its opinion on September 19, 2018 affirming the district court. On October 10, 2018, Mr. Price petitioned for rehearing *en banc*.  The Eleventh Circuit denied Mr. Price's petition for rehearing *en banc* on December 26, 2018.  Mr. Price has until March 26, 2019 to petition for certiorari in the United States Supreme Court.

30.    While Mr. Price's appeal was pending before the Eleventh Circuit, the State of Alabama amended its laws to permit the use of nitrogen

9

hypoxia in executions.  The law authorizing nitrogen hypoxia went into effect on June 1, 2018.  *See* 2018 Ala. Laws 2018-353 (S.B. 272); Ala. Code. § 15-18-82.1.

31.     The new law purports to give death row inmates 30 days to "elect" whether to be executed with nitrogen hypoxia.  The 30 day "election" period is completely arbitrary.  The law also states, however, that "[i]f lethal injection is held unconstitutional or otherwise becomes unavailable, the method of execution shall be nitrogen hypoxia," with no reference to any 30-day "election" period.  Ala. Code § 15-18-82.1(b)(2).

32.     On January 12, 2019, Mr. Price's counsel learned that the State has entered into secret agreements with numerous death row inmates, similarly situated to Mr. Price for purposes of the Fourteenth Amendment's Equal Protection Clause, that the State will execute them with nitrogen hypoxia and will not seek to execute them with lethal injection drugs, even if implementation of the nitrogen hypoxia protocol takes significant time.

33.     On January 27, 2019, Mr. Price submitted a written request to Defendant Stewart requesting execution by nitrogen hypoxia.  Mr. Price's counsel subsequently made an identical request, on Mr. Price's behalf, to Assistant Attorney General Henry Johnson.  The State denied Mr. Price's request.

34.     On January 11, 2019, the State again asked the Alabama Supreme Court to set an execution date for Mr. Price.  The State's motion is pending.

## FACTUAL ALLEGATIONS

### A.     Execution by Lethal Injection

35.     In 2002, Alabama abandoned the use of the electric chair in favor of lethal injection.

36.     In states that utilizes a three-drug lethal injection protocol, including Alabama, some form of potassium chloride is used to stop the inmate's heart.  Medical experts and law enforcement authorities agree that, unless the inmate is completely unconscious and insensate, the administration of potassium chloride will cause the inmate prolonged pain, including an excruciating burning sensation throughout the entire body, similar to the physical pain and suffering that one would experience if he were burned at the stake.  Indeed, because it causes such intense pain and suffering, the American Veterinary Medical Association prohibits the use of potassium chloride to euthanize animals unless the animal is first placed in a state of complete, total, and deep general anesthesia.

37.     In addition to potassium chloride, Alabama's three-drug protocol includes the paralytic agent rocuronium bromide.  The drug is administered second, prior to the potassium chloride.  The drug does not

11

affect consciousness or the perception of pain.  Instead, it causes paralysis of the muscles, including the diaphragm.  If an individual who is not fully unconscious and insensate is given the drug, the individual will feel as though he is being forcibly suffocated.  The individual's suffering, however, is invisible to observers because the total body paralysis prevents the individual from crying out in pain.

38.     Alabama is not the only state that utilizes a paralytic agent in its execution protocol.

**B.    The ADOC's Decision to Use a Sedative, Rather Than a General Anesthetic, Prior to the Administration of Rocuronium Bromide and Potassium Chloride**

39.     In order to comply with the Constitution's prohibition on cruel and unusual punishment, states that utilize a three-drug lethal injection protocol have historically adopted means to ensure that the inmate is unconscious and insensate prior to the administration of the potassium chloride and the paralytic agent.  In other words, the "first drug" in every three-drug protocol is not intended to kill the inmate, but rather to render the inmate unconscious and insensate to the incredibly painful drugs that follow and that actually kill the inmate.

40.     From 2002 through 2013, the ADOC used either sodium thiopental or pentobarbital to render the inmate unconscious and insensate prior to the administration of potassium chloride.

12

41.     On September 10, 2014, however, the Defendants unilaterally amended the ADOC's three-drug protocol.  Under the new protocol, neither sodium thiopental nor pentobarbital are used on Mr. Price.  Instead, the ADOC seeks to render Mr. Price unconscious and insensate by delivering 500 milligrams of midazolam hydrochloride at the outset of the execution.

42.     Midazolam hydrochloride is a sedative that is not generally used clinically as a stand-alone general anesthetic.  Midazolam hydrochloride is not an analgesic and does not suppress responses to noxious stimuli.  Unlike sodium thiopental or pentobarbital, midazolam hydrochloride will not induce general anesthesia sufficient to prevent an individual from perceiving and feeling pain from noxious stimuli such as rocuronium bromide and potassium chloride, even at high doses.  In other words, unlike pentobarbital, it is substantially likely that midazolam hydrochloride will not render Mr. Price unconscious and insensate to the pain and suffering associated with rocuronium bromide (paralysis including forced suffocation) and potassium chloride (venous burning and stoppage of the heart).

43.     Defendants' decision to utilize midazolam hydrochloride instead of a medically-accepted general anesthetic (or a *combination* of midazolam hydrochloride and a medically-accepted general anesthetic) was not based on medical literature or the advice of medical experts.  Instead,

13

Defendants' decision was based on the State's claim that sodium thiopental, pentobarbital, and all other similar general anesthetics are presently unavailable to the ADOC for use in executions. *Cf. generally Cook v. FDA*, 733 F.3d 1 (D.C. Cir. 2013) (discussing the present unavailability of sodium thiopental for use in executions).

44.     The ADOC is aware that the use of midazolam hydrochloride is substantially likely to result in an execution that is wanton and cruel in that Mr. Price will experienced prolonged and excruciating pain and suffering while the rocuronium bromide forcibly suffocates him and the potassium chloride burns his veins and internal organs and stops his heart.

45.     Consistent with the warnings of medical experts, midazolam hydrochloride has not reliably rendered inmates unconscious and insensate while the drugs that ultimately cause death are administered.  The result has been a series of "botched"—that is, prolonged and ghastly—executions that have drawn both public criticism and Department of Justice scrutiny.

46.     In Alabama, for example, midazolam hydrochloride was used in a botched execution in late 2016 when, following the administration of the 500 milligrams of midazolam hydrochloride, an inmate appeared to remain conscious.  The executioner nevertheless administered rocuronium bromide, which reportedly prompted the inmate to react by coughing, heaving, flailing, or attempting to flail arms, clenching and unclenching of fists, and

moving of lips.  In addition, during an October 2017 execution, following the administration of midazolam hydrochloride, an inmate raised his right arm for about 20 minutes into the execution and rolled his head in a grimace before falling back onto the gurney.

47.     Problems with midazolam hydrochloride are not unique to Alabama.  In Arizona, an inmate received 750 milligrams of midazolam hydrochloride along with a lethal dose of hydromorphone.  Just as numerous medical experts predicted, the midazolam hydrochloride failed to render the inmate unconscious and insensate.  As a result, the inmate died only after visibly and audibly gasping for air about 600 times over the course of nearly two hours.  Similar problems were reported in Arkansas during back-to-back execution of inmates in April 2017.  In Ohio, an inmate who received midazolam hydrochloride remained conscious and sensate during his execution, making loud "snorting" noises, visibly and audibly gasping for air.  In Oklahoma, an inmate dosed with 100 milligrams of midazolam hydrochloride was initially declared "unconscious" but, after potassium chloride was administered, repeatedly twitched, writhed, groaned, and called out "oh man" before dying over 30 minutes later.  The scene was so gruesome that prison officials tried (but failed) to stop the execution midway through.

48.     As further evidence of the ADOC's ambivalence to the risks of
midazolam hydrochloride, its description of the lethal injection protocol that
it intends to use on Mr. Price makes no mention whatsoever of a
"consciousness check" prior to the administration of the rocuronium
bromide and potassium chloride.  On information and belief, Mr. Price
alleges that the ADOC does not intend to have trained medical personnel
perform a "consciousness check" on Mr. Price prior to the administration of
the last two drugs in the protocol.

49.     Moreover, even if a "consciousness check" were performed by
qualified ADOC personnel—that is, personnel who are adequately trained to
interpret the results of a properly implemented "eyelash brush" test or "pinch
test"—it would not provide a reliable indication of whether Mr. Price would
be unconscious and insensate for the remainder of the execution procedure.
This is because, even where a large dose of midazolam hydrochloride
induces a state of anesthesia in an inmate, it is not a *deep* state of anesthesia,
and the rocuronium bromide and potassium chloride are substantially likely
to cause pain and suffering that will "break through" the midazolam
hydrochloride.  This substantial risk of "break through" pain and suffering is
precisely the reason why, in the past, the ADOC used sodium thiopental or
pentobarbital—and not midazolam hydrochloride—as the first drug in the
lethal injection protocol.

16

**C.    Alabama Adopts New Method of Execution While Mr. Price's Appeal is Pending**

50.    On March 22, 2018, Governor Kay Ivey signed Senate Bill 272, which authorized nitrogen hypoxia as a method of execution in Alabama. The law became effective on June 1, 2018.  2018 Ala. Laws 2018-353 (S.B. 272); Ala. Code. § 15-18-82.1.

51.    Hypoxia occurs when a person is deprived of sufficient amounts of oxygen, and prolonged oxygen deprivation will lead to death. Hypoxia can be induced when an individual inhales an asphyxiant gas for a prolonged period of time because an asphyxiant gas displaces the normal levels of oxygen found in the air, thus depriving a person of the necessary levels of oxygen for survival.

52.    Nitrogen is an asphyxiant gas. Although it is the most common gas on earth, representing more than 78 percent of the gas in our atmosphere, an environment that is overly enriched with nitrogen lacks the necessary levels of oxygen for human survival.  Inhalation of only one or two breaths of pure nitrogen will cause sudden loss of consciousness.  Eventually, if no oxygen is provided, a person will die.

53.    In a properly administered execution protocol utilizing nitrogen, nitrogen itself does not bring about death.  Rather, an inmate is subjected to an environment that is overly enriched with nitrogen, thus

depriving the inmate of the necessary levels of oxygen for survival, which will ultimately result in death.

54.     According to the *U.S. Chemical Safety and Hazard Investigation Board*, a person exposed to oxygen-deficient air "has no warning and cannot sense that the oxygen level is too low."  This is in contrast to asphyxiation from, for example, strangulation or the administration of a paralytic agent such as rocuronium bromide, which causes extreme anxiety and discomfort by, among other things, preventing a person from expelling carbon dioxide from the body.

55.     Properly administered gas hypoxia is among the most widely promoted forms of assisted suicide by right-to-die advocates.

56.     Pursuant to Alabama Code § 15-18-82.1(b), inmates who were under a sentence of death as of June 1, 2018 had 30 days to affirmatively elect execution by nitrogen hypoxia.  This 30-day election period is completely arbitrary.  In addition, the new law earlier states that "[i]f lethal injection is held unconstitutional or otherwise becomes unavailable, the method of execution shall be nitrogen hypoxia," without any reference to any 30-day election period.  Ala. Code § 15-18-82(a).

57.     Despite having entered into secret agreements with other Holman inmates, and despite having a written request from Mr. Price and his counsel, the State refuses to execute Mr. Price with the nitrogen hypoxia

18

protocol and instead intends to execute him with the substantially painful

midazolam-based lethal injection protocol.

**D.    Medical Evidence Demonstrates That Midazolam Hydrochloride Will Not Render Mr. Price Unconscious and Insensate While the Paralytic Agent and Potassium Chloride Forcibly Suffocate Him, Burn His Veins and Internal Organs, and Stop His Heart**

58.    Midazolam hydrochloride is a benzodiazepine.  Its FDA

approved uses include sedation, anxiolysis (relief of fear and anxiety), and

amnesia (inducing loss of memory).  Midazolam hydrochloride can also

depress respiration when administered in sufficient doses.

59.    Unlike other drugs previously used in a three-drug protocol,

such as sodium thiopental and pentobarbital, midazolam hydrochloride is not

a barbiturate.  It is not generally administered to suppress responses to

noxious stimuli and does not act as an analgesic.  The sedative properties of

midazolam hydrochloride do not suppress responses to noxious stimuli.  A

person who is sedated can still experience stimuli, including painful stimuli.

The amnesia-inducing properties of midazolam hydrochloride may prevent a

person from *remembering* the pain and suffering he experienced while under

the effects of the drug.  However, even if the individual suffers from a lack

of memory *after* the fact, the individual is absolutely experiencing pain and

suffering *during* the fact.  Unlike sodium thiopental, even at high doses,

midazolam hydrochloride will not induce a state of anesthesia sufficiently

deep to prevent an individual from perceiving and feeling the pain and suffering associated with rocuronium bromide and potassium chloride.

60. For these reasons, it is substantially likely that Mr. Price will consciously suffer the paralysis and suffocation from the administration of rocuronium bromide and the intense burning pain from the administration of potassium chloride. This suffering is substantially likely to occur notwithstanding any consciousness checks performed prior to the administration of the second and third drugs because, even when carried out properly by qualified personnel, such tests do not replicate the intensity of pain associated with the administration of potassium chloride. In other words, it is substantially likely that the intense pain associated with rocuronium bromide and potassium chloride will "break through" whatever state of general anesthesia the midazolam hydrochloride might initially induce.

61. In the "botched" Arizona execution in April 2014, describe above, the inmate received 750 milligrams of midazolam hydrochloride, yet the inmate was not rendered unconscious and insensate and died only after visibly and audibly gasping for air about 600 times over the course of nearly two hours. Medical experts believe that a reason for this failure to render the inmate unconscious and insensate may be that the brain's receptors are

quickly saturated by even low doses of midazolam hydrochloride, meaning that administering a hyper-dosage is physiologically ineffectual.

62.    Thus, even at high doses, there is a substantial likelihood that Mr. Price will experience the severe pain and suffering associated with the administration of rocuronium bromide and potassium chloride.

**E.    The Secrecy With Which the Alabama DOC Adopts and Implements Its Lethal Injection Protocol Exacerbates the Constitutional Infirmity of Its New Three-Drug Protocol**

63.    The ADOC's procedures for carrying out executions are exempt from the Alabama Administrative Procedure Act.  *See* Alabama Code § 15-18-82.1(g).  For this reason, the ADOC can change the lethal injection protocol without notice to any person and without providing interested parties the opportunity to comment on proposed changes.

64.    Alabama's lethal injection protocol does not regulate the source of the drugs to be used in executions.  Because states have experienced difficulties obtaining drugs for lethal injection from FDA-approved manufacturers, there is a substantial risk that Alabama will use drugs obtained from compounding pharmacies to carry out Mr. Price's execution.

65.    Compounding pharmacies mix or alter ingredients to produce individually customized medications.  The FDA does not regulate the safety and efficacy of drugs produced by compounding pharmacies.  Because of the lack of regulation of compounding pharmacies, the use of compounded

21

drugs in an execution may create a substantial risk that such drugs will lack the efficacy, purity, or potency necessary to operate as intended by the lethal injection protocol.  Therefore, any lethal injection protocol involving compounded drugs must be subject to certain safeguards that ensure the protocol is compatible with the Eighth Amendment.

## F.     Defendants' Failure to Consistently Perform an Adequate Consciousness Assessment Creates a Substantial Risk of Unnecessary Suffering and Introduces Selective Risk Into Executions

66.     Upon information and belief, in Alabama, executions are administered by non-medical personnel who lack training in administering intravenous drugs and are not qualified to determine whether an inmate is completely unconscious and insensate.  This both creates and exacerbates a substantial risk that officials will depart from the protocol, fail to administer the drugs correctly, or otherwise fail to carry out the execution in a manner that complies with constitutional requirements.

67.     Upon information and belief, Defendants have failed to consistently implement a consciousness assessment in a manner that ensures that every inmate is unconscious before the administration of rocuronium bromide and potassium chloride.  In some cases, Defendants have completely failed to perform a consciousness assessment.

68.     Even if a "pinch test" is performed, the ADOC does not employ personnel medically trained on the proper administration of the pinch test. Personnel administering the pinch test lack training and knowledge of how hard to pinch inmates in order to properly conduct the pinch test.  In addition, the ADOC has failed to implement effective training protocols to ensure that the pinch test safeguard is applied equally across executions. Thus, even assuming that the proper use of a "consciousness check" could provide a reliable indication of whether an inmate is and will remain unconscious and insensate for the remainder of the execution procedure, the State has not undertaken adequate procedures to ensure that any "consciousness check" is done properly.

69.     The ADOC's failures to implement and consistently perform an effective and consistent consciousness test raise a serious and unnecessary risk that inmates will not be unconscious during the administration of the second and third drugs in the lethal injection protocol.  If an inmate was conscious during the administration of rocuronium bromide and potassium chloride, that inmate would experience intolerable pain in violation of the Eighth Amendment's protections against cruel and unusual punishment.

70.     In addition, the ADOC's failure to consistently and uniformly perform a consciousness assessment on an inmate selectively introduces additional risk in some lethal executions but not others.  *Cooey* v. *Kasich*,

801 F. Supp. 2d 623,653 (S.D. Ohio 2011).  Defendants' failure to abide by the procedural safeguards to assess consciousness in all inmates impermissibly burdens Mr. Price's right to Equal Protection under the U.S. Constitution.

## FIRST CAUSE OF ACTION

### Violation of the Eighth Amendment's
### Ban on Cruel and Unusual Punishment

71.    Mr. Price repeats and realleges the allegations in paragraphs 1 through 70 as though fully set forth herein.

72.    The State of Alabama has announced the intention to execute Mr. Price using a three-drug protocol consisting of (a) 500 milligrams of midazolam hydrochloride, (b) 600 milligrams of rocuronium bromide, and (c) 240 milliequivalents of potassium chloride.

73.    Defendants are acting under the color of Alabama law in undertaking to execute Mr. Price using the DOC's new three-drug protocol.

74.    It is substantially likely that midazolam hydrochloride will fail to render Mr. Price unconscious and insensate during the remainder of the execution, and that Mr. Price will therefore experience prolonged, excruciating, and needless pain while the rocuronium bromide forcibly suffocates him and the potassium chloride burns his veins and internal organs and stops his heart.

75.     Defendants are acting knowingly and with deliberate indifference to a feasible and readily implemented alternative, nitrogen hypoxia, which would significantly reduce the substantial risk of severe pain to Mr. Price and which is approved for use in Alabama.

76.     The violation of Mr. Price's constitutional rights is exacerbated by (a) the risk that the State of Alabama will obtain other drugs from non-FDA approved sources, (b) the secret process through which the Alabama DOC adopts and implements its lethal injection protocol, and (c) the inadequacy of whatever "consciousness checks" the Alabama DOC intends to perform prior to administering the rocuronium bromide and potassium chloride.

77.     If Alabama's three-drug protocol is used to execute Mr. Price, Mr. Price will be subject to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

## SECOND CAUSE OF ACTION

**Violation of Mr. Price's Right to Equal Protection Under the Law Pursuant to the Fourteenth Amendment to the United States Constitution for Failure to Consistently Comply with Execution Protocol**

78.     Mr. Price repeats and realleges the allegations in paragraphs 1 through 77 as though fully set forth herein.

79.     A plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment burdens a fundamental right, targets a suspect class, or has no rational basis in order to establish a claim for relief under the Equal Protection Clause.  *Cooey*, 801 F. Supp. 2d at 652; *see also Harper* v. *Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966).

80.     The U.S. Constitution provides Mr. Price with a fundamental right to be free from cruel and unusual punishment, which will be burdened when a State's execution team "negat[es] . . . precise procedural safeguards" or strays from a written protocol's execution process.  *Cooey*, 801 F. Supp. 2d at 653.

81.     Upon information and belief, Defendants have materially deviated from their written execution protocol, including the failure to administer the pinch test in prior executions, which impermissibly burdens Mr. Price's rights to be free from cruel and unusual punishment.  The failure to pinch the inmate's arm prior to paralyzing the inmate with rocuronium bromide and injecting potassium chloride puts the inmate at a substantial risk of serious harm.

82.     Upon information and belief, Defendants have also failed to take steps to prevent material deviations from their lethal injection procedures in future executions, including failing to adequately  train

members of the execution team about how to conduct a sufficient consciousness assessment, the purpose of the consciousness assessment, and how to indicate an inmate's consciousness during the execution process.

83.    Upon information and belief, Alabama does not employ medically-trained personnel, or at least personnel trained specifically on determining consciousness through the administration of the consciousness test.  Even if the pinch test is performed, personnel administering the pinch test lack sufficient understanding of the purpose of the test or how to effectively carry it out.  These personnel also lack training and knowledge of how hard to pinch inmates in order to conduct the consciousness assessment.

84.    In addition, Alabama has not implemented effective training protocols to ensure that the consciousness test safeguard is applied equally across executions, which raises a risk that inmates will not be unconscious during the administration of rocuronium bromide and potassium chloride.

85.    Due to their failures and deviations described above, Defendants selectively introduced unnecessary risk into certain executions without any compelling reason for doing so.  *Cooey*, 801 F. Supp. 2d at 653 ("Mere pursuit of administrative convenience that risks flawed executions is not a legitimate state interest.").  Deviations from the State's lethal injection protocol and the Defendants' failure to adhere to Alabama's purported safeguard to assess consciousness impermissibly burden Mr. Price's

fundamental right to Equal Protection under the Fourteenth Amendment to the U.S. Constitution.

86.    Even if Defendants promised to perform a consciousness assessment at every future execution, such a promise would be insufficient to dispose of Mr. Price's Equal Protection claim because "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case; if it did, the courts would be compelled to leave the defendant free to return to his old ways." *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968) (internal quotation omitted); *see also County of Los Angeles* v. *Davis*, 440 U.S. 625, 631 (1979).  The Eleventh Circuit has also recognized that "[Alabama's] protocol is not certain and could be unexpectedly changed" prior to Mr. Price's execution.  *Arthur v. Thomas*, 674 F. 3d. 1257, 1263 (11th Cir. 2012).

## THIRD CAUSE OF ACTION

### Violation of Mr. Price's Right to Equal Protection Under the Law Pursuant to the Fourteenth Amendment to the United States Constitution for Refusal to Allow Mr. Price to Elect Execution by Nitrogen Hypoxia

87.    Mr. Price repeats and realleges the allegations in paragraphs 1 through 86 as though fully set forth herein.

88.    "'The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against

28

intentional and arbitrary discrimination, whether occasioned by express

terms or a statute or by its improper execution through duly constituted

agents.'").  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564-65 (2000)

(quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)).

A plaintiff is deprived equal protection of the law if State treats them

disparately than similarly situated individuals without justification, and

where the State burdens a fundamental right, the State must have a

[compelling] reason for the disparate treatment of alike individuals.  *See*

*Vacco v. Quill*, 521 U.S. 793, 799 (1997) (explaining that the Equal

Protection Clause "embodies a general rule that States must treat like cases

alike"); *Stanton v. Stanton*, 421 U.S. 7, 14 (1975) ('A classification must be

reasonable, not arbitrary, and must rest upon some ground of difference

having a fair and substantial relation to the object of the legislation, so that

all persons similarly circumstanced shall be treated alike.").

89.    Mr. Price has a fundamental right to be free from cruel and

unusual punishment under the Eighth Amendment to the United States

Constitution, and that right will be burdened if the State proceeds with its

plan to execute Mr. Price using an ineffective three-drug execution protocol

despite the availability of a feasible and readily-available alternative method

of execution that that would substantially reduce the risk of severe pain that

is associated with the three-drug protocol.  *See Glossip v. Gross*, 135 S.Ct. 2726 (2015).

90.     Defendants have agreed to use the recently authorized method of execution utilizing nitrogen hypoxia, and not to use the midazolam-based lethal injection protocol, to execute inmates who are similarly situated to Mr. Price.

91.     Although Mr. Price has requested to be executed by nitrogen hypoxia, a significantly safer alternative than the three-drug protocol utilizing midazolam, Defendants have rejected Mr. Price request and intend to execute Mr. Price using a three-drug protocol.

92.     The State has no basis that could survive the requisite level of Fourteenth Amendment scrutiny for carrying out the execution of some inmates, including Mr. Price, with a wholly inadequate method of execution, while agreeing to execute other similarly situated inmates by nitrogen hypoxia.

93.     Accordingly, Mr. Price will be denied equal protection of law under the Fourteenth Amendment because Defendants intend to treat Mr. Price disparately from other similarly situated inmates and, in so doing, will impinge on Mr. Price's fundamental right to be free from cruel and unusual punishment.

## PRAYER FOR RELIEF

94.     For these reasons, Mr. Price respectfully requests that this

Court:

a.      Enjoin Defendants from executing Mr. Price using the

lethal injection protocol that the State asserts that it adopted on September

10, 2014, as well as the inadequate anesthesia and execution procedures that

violate Mr. Price's right to equal protection under the Fourteenth

Amendment and his right to be free from cruel and usual punishment under

the Eighth Amendment.

b.      Order Defendants to disclose to Mr. Price and his counsel

the precise lethal injection protocol that will be used during Mr. Price's

execution at least 90 days in advance of such execution, including a detailed

description of the "consciousness checks" that will be utilized and the

qualifications and training of the personnel designated to carry out such

checks.

c.      Enter a declaratory judgment that Defendants' proposed

execution protocol, inadequate anesthesia, and execution procedures violate

Mr. Price's right to equal protection pursuant to the Fourteenth Amendment

and Mr. Price's right to be free from cruel and unusual punishment pursuant

to the Eighth Amendment to the United States Constitution.

       d.       Grant any further relief that the Court deems just and

proper.

                                ROPES & GRAY LLP

Dated: February 8, 2019          <u>/s/ Aaron M. Katz</u>
                                Aaron M. Katz (motion for admission
                                *pro hac vice* pending)
                                David M. Coriell (motion for
                                admission *pro hac vice* pending)
                                Ropes & Gray LLP
                                800 Boylston Street
                                Boston, MA 02199
                                (617) 951-7000
                                aaron.katz@ropesgray.com
                                david.coriell@ropesgray.com

                                *Attorneys for Plaintiff Christopher*
                                *Lee Price*